NOT FOR PUBLICATION

# UNITED  STATES  DISTRICT  COURT
# DISTRICT OF NEW JERSEY

JESSICA FRANCO,

                                    Plaintiff,

v.

THE PORT AUTHORITY OF NEW
YORK AND NEW JERSEY,

                                    Defendant.

Case No. 20cv12160 (EP) (JBC)

**OPINION**

**PADIN, District Judge.**

Plaintiff Jessica Franco ("Plaintiff" or "Franco") brings one claim against Defendant Port Authority of New York and New Jersey ("Defendant" or "Port Authority"), her employer, under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*.

This matter comes before the Court upon Plaintiff and Defendant's respective motions for summary judgment pursuant to Fed. R. Civ. P. 56. *See* D.E. 28-10; D.E. 27-1.  The Court decides these motions on the papers pursuant to Fed. R. Civ. P. 78 and L.Civ.R.78.1(b).  For the reasons set forth below, the Court concludes that Defendant's "medical examination" did not violate the Rehabilitation Act as it was job-related and consistent with business necessity, and as such, summary judgment will be GRANTED in favor of Defendant.

## I.      BACKGROUND

Defendant is a bi-state governmental agency that operates in the New Jersey/New York metropolitan area.  *See* D.E. 1 "Compl." ¶ 2.  Defendant employs and oversees approximately 2,300 police officers, who are responsible for ensuring the safety and security of all of Defendant's

transportation facilities through a variety of different duties.  Port Authority NY NJ About PAPD, *https://www.panynj.gov/police/en/about.html* (last visited Nov. 10, 2022).

Plaintiff has been employed as a police officer for Defendant since she graduated from the police academy in October 2008.  D.E. 28-11 "Pl. 56.1 Stmt." ¶ 2.  Beginning in 2019, Plaintiff was assigned to patrol duties at the Staten Island bridges.  *Id.* ¶ 3.  In that role, Plaintiff was responsible for ensuring public safety on the Bayonne Bridge, Geothals Bridge and the Outerbridge Crossing.  *Id.* ¶ 4.  Specifically, Plaintiff's duties included patrolling "assigned posts by vehicle or foot, directing the movement of pedestrian and vehicular traffic, enforcing laws and regulations and preventing crime, conducting arrests as appropriate, performing paperwork as necessary, answering questions, and being generally responsible for the protection of life and property at [her] assigned location during [her] tour."  *Id.*

On July 16, 2018, Defendant adopted several revised policies governing when and what procedures a police officer had to follow in order to return to duty after different types of medical absences.  D.E. 27-4.  Amongst these policies, was its policy[1] that a police officer "absent for more than thirty (30) consecutive calendar days on account of illness or injury, not incurred in the line of duty, shall not be returned to duty until the [police officer] has a fitness for duty evaluation and has been cleared for duty by [the Office of Medical Services ("OMS")]."  *Id.* at 4.

Dr. Fisher, one of Defendant's doctors, provided further details about why police officers who take an extended medical leave of 30 or more consecutive calendar days are subject to fitness for duty ("fit-for-duty") examinations under the Extended Leave Policy.  Specifically, when asked why 30 days was the point at which such an examination was required, Dr. Fisher indicated that when someone is out for such an extended period of time that the person is likely to be suffering

---

[1] The Court will refer to this specific policy as the "Extended Leave Policy."

from a serious condition that could affect how she discharges her duties. *See* D.E. 27-5 at 37:20-24. In making that determination, Defendant's doctors reviewed medical textbooks and discussed medical conditions that could cause a person to be out for an extended period of time. *Id.* at 40:2-18. The fit-for-duty examination is only focused on why the person was out "for that particular absence[.]" *Id.* at 40:24-41:5.

Furthermore, Dr. Fisher explained that without knowing the reason(s) why a police officer took an extended medical leave, Defendant's doctors would be unable to determine whether the police officer, like Plaintiff, who "carries a firearm and is responsible for public safety[,]" could safely discharge her duties. *See id.* at 127:9-128:7. Dr. Fisher also testified that Defendant's doctors are better positioned than a police officer's primary care doctor to determine whether the police officer is fit-for-duty because Defendant's doctors "have knowledge of the different types of jobs that our employees perform. We all have job descriptions of each job title, and we see our employees on a daily basis, so we know what the responsibilities, the physical requirements and the psychological requirements are of different job titles." *Id.* at 116:1-7. He confirmed that there are times where Defendant's doctors may disagree with a police officer's primary care doctor's conclusion that she is fit-for-duty. *Id.* at 116:13-17.

Beginning on or about April 15, 2020 and ending on or about June 6, 2020, Plaintiff took a medical leave of absence. Compl. ¶ 7. Plaintiff's leave spanned a total of 52 consecutive calendar days. D.E. 27-12 "Def. 56.1 Stmt." ¶ 42. On April 15, 2020, Plaintiff provided Defendant with a medical certification from her primary care doctor that provided only the following substantive information: Plaintiff's first date of treatment for "this condition" with her primary care doctor was March 25, 2020; Plaintiff "will be able to perform full duties"[2] as of May 13,

---

[2] What "full duties" entails or whether Plaintiff's specific duties as a patrol police officer were considered is not specified in the medical certification.

2020; and Plaintiff's next appointment would be on May 8, 2020.  D.E. 27-9.  On May 8, 2020, Plaintiff provided Defendant with a second medical certification from her primary care doctor that provided only the following additional substantive information: Plaintiff saw her primary care doctor on May 8, 2020; Plaintiff could not return to work as of May 13, 2020 in her capacity as a police officer; Plaintiff "will be able to perform full duties"[3] as of June 6, 2020; and Plaintiff's next appointment would be on May 29, 2020.  D.E. 27-10.  The second medical certification delayed Plaintiff's anticipated ability to perform her full duties from May 13, 2020 to June 6, 2020. Plaintiff did not submit any additional medical certifications to Defendant.  Def. 56.1 Stmt. ¶ 41; D.E. 27-8 at 60:8-21.

Pursuant to its Extended Leave Policy, Defendant scheduled Plaintiff for a fit-for-duty examination for June 8, 2020.  Def. 56.1 Stmt. ¶ 43.  The fit-for-duty examination was required under the Extended Leave Policy before Plaintiff would be permitted to return to her patrol police officer duties because her medical absence extended beyond 30 consecutive calendar days.  D.E. 27-11.

On June 8, 2020, Dr. Li, another of Defendant's doctors, met with Plaintiff for her fit-for-duty examination.  Def. 56.1 Stmt. ¶ 44; D.E. 27-6 at 65:3-17.  During the examination, Plaintiff stated that she was doing well and was ready to return to work.  D.E. 27-6 at 65:9-17.  But Plaintiff refused to tell Dr. Li the reason(s) why she had taken an extended medical leave that lasted 52 consecutive calendar days.  *Id.* at 62:10-64:7; D.E. 27-8 at 65:9-22.  Dr. Li asked Plaintiff if she would rather speak with Dr. Fisher, but Plaintiff stated that she would not answer the question for Dr. Fisher either.  D.E. 27-6 at 62:25-63:3.  Dr. Li did not clear Plaintiff as fit-for-duty because she did not know the reason(s) for Plaintiff's extended medical absence, and based on the Extended

---

[3] Again, what "full duties" entails or whether Plaintiff's specific duties as a patrol police officer were considered is not specified in the medical certification.

4

Leave Policy, Defendant could not clear her as fit-for-duty without knowing that information. *Id.* at 108:15-109:20.  Dr. Li testified that Plaintiff, as a police officer, had a sensitive job and carried a gun as part of that job, so without knowing the reason(s) why Plaintiff was absent for 52 consecutive calendar days, then Dr. Li could not clear her as fit-for-duty. *Id.* at 109:10-20.  A follow-up fit-for-duty examination was scheduled for the following week. *Id.* at 63:6-10; D.E. 27-8 at 67:16-22.

On June 15, 2020, Plaintiff met with Dr. Li for her follow-up fit-for-duty examination. D.E. 27-8 at 73:2-6.  Again, Plaintiff refused to inform Dr. Li the reason(s) why she had taken the 52 consecutive calendar-day medical absence. *See id.* at 74:10-13; D.E. 27-6 at 121:75-23. According to Defendant, Plaintiff told Dr. Li that she could call her primary care doctor, but Dr. Li informed her that she would only do so if Plaintiff signed a HIPAA release form, which Plaintiff refused to do, so Dr. Li never spoke with Plaintiff's primary care doctor.  D.E. 27-6 at 121:10-122:6.[4]  Plaintiff was not cleared as fit-for-duty.

At the time of the June 8 and June 15, 2020 examinations, Dr. Li had access to the nearly two month and one month-old medical certifications from Plaintiff's primary care doctor.  But Dr. Li did not rely on the dates provided in those certifications to determine whether Plaintiff was fit-for-duty because "the best judgment for return to work should be made at the closest evaluation date." *Id.* at 101:10-21.

As a result of Defendant's decision not to clear Plaintiff as fit-for-duty because it could not conclude that she could safely discharge her patrol police officer duties without knowing the reason(s) for her extended medical absence, Plaintiff filed this suit alleging a violation of the Rehabilitation Act. *See* Compl.  Both Plaintiff and Defendant have now moved for summary

---

[4] According to Plaintiff, she does not recall one way or the other whether she told Dr. Li to call her primary care doctor.  D.E. 27-8 at 73:22-25.

judgment.  *See* D.E. 28-10 "Pl. Mot."; *see also* D.E. 27-1 "Def. Mot."  Being fully-briefed, the Court now decides these motions.

## II.       STANDARD OF REVIEW

The party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 136, 145-46 (3d Cir. 2004).  The moving party must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has adequately supported its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  The nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,  250 (1986).  The nonmoving party "cannot create an issue of fact merely by [] denying averments [] without producing any support evidence of the denials."  *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted).  Where the nonmoving party's "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).  But "[i]f reasonable minds could differ as to the import of the evidence," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250-51.

A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Disputes over irrelevant or

unnecessary facts will not preclude the Court from granting a motion for summary judgment.  *See id.*

In reviewing a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 322.  Likewise, if review of cross-motions for summary judgment reveals no genuine issue of material fact, then summary judgment may be entered in favor of the party deserving such judgment in light of the law and undisputed material facts.  *See Iberia Foods Corp. v. Romeo Jr.*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

## III.       DISCUSSION

### A. **Plaintiff Does Not Make Out a Typical Rehabilitation Act Claim**

Defendant first argues that Plaintiff's Rehabilitation Act claim must fail because Plaintiff does not meet the relevant statutory definition of "disability," which is typically necessary of such a claim.  Plaintiff responds that she does not need to meet that definition for her claim to proceed because her claim is premised on subsections (d)(1) and (4) of 42 U.S.C. § 12112—permitted under 29 U.S.C. § 794(d)—which provides an avenue of relief for non-disabled employees.  The Court agrees with Plaintiff for the reasons explained below.

Generally, the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 791 *et seq.*, provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by certain

covered entities [5] "solely by reason of his or her disability." 29 U.S.C. § 794(a).  Under the Rehab Act,[6] a "disability" is: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) record of such an impairment; or (3) being regarded as having such an impairment.  *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1).  Major life activities include, *inter alia*, functions such as caring for one's self, performing manual tasks, walking seeing, hearing, breathing, learning, and working.  45 CFR 84.3(j)(2)(ii).  Thus, typically to bring a claim under the Rehab Act, a plaintiff must satisfy the statutory definition of disability.

But subsection (d) of the Rehab Act has been found to indirectly provide a separate avenue for a non-disabled employee to seek relief from an employer who requires a mental examination or inquiry.  *See generally* 29 U.S.C. § 794(d).  Specifically, subsection (d) states: "[t]he standards used to determine whether the Rehab Act has been violated in a complaint alleging employment discrimination under this Act shall be the standards applied under [the American with Disabilities Act ("ADA")] (*42 U.S.C. 12111 et seq.*)[,] as such sections relate to employment."  *Id.* (emphasis added).  Thus, following the guidance of this subsection, an employee may seek relief under the standard set out in 42 U.S.C. §§ 12112(d)(1) and (4).

42 U.S.C. § 12112(d)(1) provides that "medical examinations and inquiries" may form the basis for an ADA, and therefore also a Rehab Act, claim.  And 42 U.S.C. § 12112(d)(4) provides the applicable standard for determining whether a medical exam or inquiry violates the ADA, and therefore also the Rehab Act.  Significantly, this subsection states that while an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, [it may do so if] such examination or inquiry is shown to be *job-related and consistent with business*

---

[5] The parties do not dispute that Defendant is a covered entity.
[6] And the Americans with Disabilities Act ("ADA").

*necessity.*" 42 U.S.C. § 12112(d)(4)(A) (emphasis added).  But the information that may be obtained is limited to "inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

What subsections (d)(1) and (4) do not explicitly provide is whether an employee seeking relief under these subsections must be disabled.  But many courts have concluded that an employee need not be disabled to bring an ADA or Rehab Act claim under these particular subsections.  *See, e.g.*, *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 336 n.1 (4th Cir. 2022) (noting that "[o]ther circuits to address this issue have found that improper medical inquiry claims under the ADA § 12112(d)(4)(A) [(also applicable to the Rehab Act)] stand apart from general claims of discrimination under [the ADA and Rehab Act] and do not require the plaintiff to show he is disabled" (citation omitted)); *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 522 (7th Cir. 2015); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013) (concluding that "§ 12112(d)(4)(A) protects employees who are not disabled"); *Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011) ("A plaintiff need not prove that [she] has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d).") (citation omitted); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94-95 (2d Cir. 2002); *Roe v. Cheyenne Mountain Conference Resort*, 124 F.3d 1221, 1229 (10th Cir. 1997) (It makes little sense to require an employee to demonstrate that [she] has a disability unknown to [her] employer in order to challenge a medical inquiry or examination under 42 U.S.C. § 12112(d)(4)(A).") (citation and internal quotation marks omitted). Courts have explained that to limit relief to disabled employees would force an employee to prove that "[s]he is in fact disabled in order to invoke the protection of [subsection] (d)(4)[, which] would undermine the policy that an employer may not ascertain whether an employee is disabled unless

the disability relates to [her] job."  *See, e.g.*, *Jackson v. Lake County*, 2003 U.S. Dist. LEXIS 16244, at *27 (N.D. Ill. Sept. 26, 2003).  Thus, these sister courts, and this Court, agree, that an employee seeking relief pursuant to the ADA and/or the Rehab Act under subsections (d)(1) and (4) does not need to show she is disabled to bring a claim against an employer who requires a medical examination or inquiry.  *See id.*; *see also Lacroix v. Boston Police Dep't*, 2022 U.S. Dist. LEXIS 52977, at *10 (D. Mass. March 24, 2022).

Here, Defendant argues that Plaintiff's Rehab Claim must fail because she is not disabled within the meaning of the statute.  *See* Def. Mot. at 21-30.  The Court agrees with Defendant to the extent that a typical Rehab Act claim would require Plaintiff to demonstrate, by a preponderance of the evidence, that she is disabled, and that Plaintiff's complaint reasonably led Defendant to believe Plaintiff was making out a typical Rehab Act claim.  Compl. ¶ 19 ("Defendant has violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, by discriminating against plaintiff *based on the false perception that plaintiff suffers from a disability*.") (emphasis added).  It follows that because Plaintiff has made no attempt, beyond the Complaint itself, to demonstrate that she meets the relevant statutory definition of disabled, the Court agrees with Defendant that Plaintiff has not made out a typical Rehab Act claim.[7]

---

[7] If Plaintiff had made out a typical Rehab Act claim, then the typical three-step burden-shifting framework would have applied.  The Court outlines what that framework requires.  First, a plaintiff must make out a *prima facie* case of discrimination.  *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).  Under this step, the plaintiff's burden is to demonstrate that she: (1) has a disability; (2) was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations; and (3) nonetheless suffered an adverse employment action solely because of her disability.  *See Gilette v. Donahoe*, 622 F. App'x 178, 181 (3d Cir. 2015); *Shiring*, 90 F.3d at 831; *Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir. 1994) (citing *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993), *cert. denied*, 511 U.S. 1011 (1994)); *Berardi v. Del. River Port Auth.*, 2005 U.S. Dist. LEXIS 42299, at *8 (D.N.J. June 7, 2005).  Second, if the plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the defendant to provide a non-discriminatory explanation for the employment decision.  *See Walton v. Mental Health Ass'n of S.E. Pa.*, 168 F.3d 661, 668 (3d Cir. 1999); *Berardi*, 2005 U.S. Dist. LEXIS 42299, at *8-9.  Third, if the defendant provides a non-discriminatory explanation, the burden shifts back to the plaintiff

But, although it is not a model of clarity, the Complaint does not solely rely on Plaintiff's ability to make out a typical Rehab Act claim.  Instead, the Complaint also pleads a Rehab Act claim premised on 29 U.S.C. § 794(d)'s directive.  In turn, this directive permits Plaintiff to bring a Rehab Act claim based on the standard outlined in 42 U.S.C. §§ 12112(d)(1) and (4).  *See* Compl. ¶¶ 14-16 ("Pursuant to 29 U.S.C. § 794(d)…"  And "[t]he ADA prohibits employers from requiring employees to disclose particular diagnoses when out sick unless the employer has reason to believe the employee cannot perform the job or is not absent for legitimate medical reasons. [] Defendant does not have substantial reason to doubt plaintiff's ability to perform the essential functions of her job in light of the note provided by plaintiff.").  As the Court has already explained, a Rehab Act claim premised on 42 U.S.C. §§ 12112(d)(1) and (4) (by way of 29 U.S.C. § 794(d)) does not limit relief to only disabled plaintiffs.  Thus, the Court will next address whether either party is entitled to summary judgment based on this particular avenue of relief.

**B.  Defendant Satisfies the Business Necessity Exception**

Having concluded that Plaintiff has not made out a typical Rehab Act claim, the Court will now address whether Defendant's Extended Leave Policy, requiring that a police officer returning from an extended leave of absence (30 or more consecutive calendar days) undergoes a fit-for-duty examination, violates 42 U.S.C. §§ 12112(d)(1) and (4).  The answer is yes if Defendant's fit-for-duty examination was not "job-related and consistent with business necessity."  *See* 42 U.S.C. § 12112(d)(1)(4) ("Business Necessity Exception").  For the reasons detailed below, the

---

to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Walton*, 168 F.3d at 668 (quoting *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996)).

Court concludes that Defendant's fit-for-duty examination qualifies for the Business Necessity Exception, and thus, does not violate the Rehab Act.

The burden of establishing whether a medical examination or inquiry is job-related and consistent with business necessity falls on the employer, not the employee. The employer's burden is high, and the test is an objective one. *See Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001). An employer meets its burden under the Business Necessity Exception if it demonstrates: (1) the asserted business necessity is vital to its business; (2) the medical examination or inquiry genuinely serves the asserted business necessity and that the request is no broader nor more intrusive than necessary, but this does not mean that the employer needs to show that the medical examination or inquiry is the only way of achieving its business necessity, so long as it is a reasonably effective method of achieving the asserted business necessity; and (3) if the medical examination or inquiry is part of a general policy affecting a broad class of employees, then the employer must also show that it has reasons consistent with business necessity for defining the class in the way that it did. *See Transp. Workers Union, Local 100 v. N.Y. City Transit Auth.*, 341 F. Supp. 2d 432, 446 (S.D.N.Y. 2004) (citing *Conroy*)) (quotation marks omitted); *see also Port. Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J.*, 283 F. Supp. 3d 72, 82 (S.D.N.Y. 2017). The Court takes each element of Defendant's burden in turn.

1. *Defendant has a vital business interest in the safety of the public and its police officers*

First, the Court must determine whether Defendant's asserted business necessity is vital to its business. Defendant contends that its fit-for-duty examination, required after 30 or more consecutive calendar days of medical leave, is necessary to protect: (1) public safety; and (2) the safety of police officers. D.E. 32-11 "Def. Opp'n" at 9; *see also* Def. Mot. at 2-4. Defendant underscores the significant, potential dangers posed by an unfit police officer returning to duty,

12

such as the use of deadly force in an unwarranted situation or an undue delay in responding to a life-threatening situation. Def. Opp'n at 9. Plaintiff does not substantively rebut that Defendant's asserted business interest, public safety and police officer safety, is not vital to Defendant's business. Instead, Plaintiff asserts that Defendant did not have any reason to doubt Plaintiff's ability to perform her duties, such that a fit-for-duty examination would be necessary before allowing her to return to her police officer duties. Pl. Mot. at 16-20. The Court agrees that Defendant has a vital business interest in protecting the safety of the public and its police officers, as well as that Defendant had objective reasons to doubt Plaintiff's ability to return to her police officer duties, such that requiring a fit-for-duty examination was appropriate.

In *Port Auth. Police Benevolent Ass'n*, the Port Authority of New York and New Jersey's ("Port Authority") absence policy was challenged.[8] 283 F. Supp. 3d at 88. The absence policy required police officers to report to the Office of Medical Services ("OMS") on their sixth day of absence for a fit-for-duty examination, and then every two to four weeks depending on the injury or illness. *Id.* The fit-for-duty examination included: "(1) a medical history directed to the reasons the employee [was] absent and what the symptoms [were]; and (2) a medical examination tailored to the illness or injury." *Id.* at 80. Port Authority claimed that the fit-for-duty examination was, in part, necessary "to determine whether the police officer can safely return to work in some capacity." *Id.* The district court accepted Port Authority's business necessity as vital to its business, "given Port Authority's responsibility for maintaining safety and security at its facilities and responding to emergencies." *See id.*

Here, like in *Port Auth. Police Benevolent Ass'n*, the Court accepts that Defendant has a vital business interest in ensuring the safety of both the public and its police officers. The

---

[8] The Extended Leave Policy challenged in the case at bar is the revised version of the policy that was challenged in *Port Auth. Police Benevolent Ass'n*.

employment of police officers with Defendant is governed by a Memorandum of Agreement between Defendant and the Port Authority Police Benevolent Association, Inc., which outlines, *inter alia*, the duties and responsibilities of police officers, like Plaintiff.   This agreement demonstrates the breadth and legitimacy of Defendant's business interest.  *See generally* D.E. 27-7.

Specifically, this agreement details the typical duties of Defendant's police officers, which include, but are not limited to: patrolling by foot or vehicle, protecting property, preventing unlawful conduct and incidents, cautioning and apprehending violators, directing the movement of traffic, operating tractors and towing equipment and removing stalled vehicles from bridges and contiguous roadways, operating emergency equipment and responding to airport alerts, fighting fires, administering first aid and taking other related actions as necessary in emergencies, enforcing all laws and regulations in accordance with New Jersey and New York laws, issuing summons, making arrests, giving testimony when necessary, and more generally protecting life and property at facilities, preventing crime, answering inquiries, and performing other related police duties.  *Id.* at 217-219.  And that Defendant's police officers are required to: understand and follow oral and written instructions, observe situations analytically, objectively, and make decisions in emergencies, be able to continuously stand and/or walk, be able to occasionally run and engage in physically demanding activities, and use firearms skillfully.  *Id.* at 219.  With these significant duties for context, the Court finds that there is no genuine issue of material fact that Defendant has a vital business interest in ensuring the safety of both the public and its police officers.

Additionally, Defendant had three objective reasons to doubt Plaintiff's ability to return to her police officer duties, such that requiring a fit-for-duty examination was appropriate.  First, Plaintiff claims that Defendant had no reason to doubt that she was able to return to her police

14

officer duties because she provided two medical certifications from her primary care doctor stating that she was fit-for-duty. *See* D.E. 30 "Pl. Opp'n" at 20-21. But Defendant persuasively responds that it could not rely on those two medical certifications because they did not provide sufficient information that would allow Defendant's doctors to conclude that Plaintiff was in fact fit-for-duty as a police officer. *See* Def. Mot. at 7-9. The Court finds Defendant's position objectively reasonable because there is no evidence that Plaintiff's primary care doctor was qualified to determine whether Plaintiff could safely perform her duties *as a police officer*. As detailed in the preceding paragraph, the duties of a police officer are extensive, and as such Defendant's doctors, who are familiar with the duties of a police officer, like Plaintiff, had reason to doubt that Plaintiff's primary care doctor, who they had no reason to believe was particularly familiar with those duties, could come to a reliable conclusion as to whether Plaintiff could perform her police officer duties safely.

Furthermore, the Court notes that Plaintiff's suggestion that Defendant could have provided Plaintiff's primary care doctor with Plaintiff's job description and asked him/her whether Plaintiff was capable of performing the essential functions of her job, rather than engage in its own fit-for-duty examination, *see* Pl. Mot. at 27, does not negate the fact that Defendant's doctors have more experience and familiarity with the duties of police officers than Plaintiff's primary care doctor. Adopting Plaintiff's position would lead to two possible results, both of which would be undesirable: (1) if Defendant blindly relied on the medical certifications provided by Plaintiff's primary care doctor, then Defendant may have risked unintentionally returning a potentially unfit-for-duty police officer to work, which would run afoul of its legitimate business interest; or (2) Defendant would need to embark on a fishing expedition to confirm that Plaintiff's primary care

doctor took into account what Defendant's experienced doctors would have focused on in their narrowly tailored fit-for-duty evaluation, which would result in an overly intrusive inquiry.

Second, in further support of its doubt, Defendant asserts that the most recent medical certification Plaintiff provided was outdated—as it was four weeks old—by the time Plaintiff attempted to return to her police officer duties. Def. Mot. at 12-14. Specifically, the second medical certification from May 8, 2020 provided that Plaintiff could return to work on June 6, 2020 (nearly two months after Plaintiff first took leave). *See* 27-6 at 98:1-9, 100:21-25. As Dr. Li, one of Defendant's doctors, notes, Plaintiff went to see her primary care doctor on May 29, 2020, but did not provide Defendant with an updated medical certification. *See* 27-6 at 101:6-21. By the time Plaintiff attempted to return to work in June, the medical certification that she provided was four weeks old, such that Defendant's doctors would reasonably doubt its accuracy at that point in time. *See id.* ("I think the best judgment for return to work should be made at the closest evaluation date."). The Court agrees that Defendant could reasonably doubt the reliability of Plaintiff's outdated medical certification.

Finally, Defendant provides yet another reason to doubt that Plaintiff would be able to discharge her police officer duties safely: Plaintiff was absent for a long period of time, 52 consecutive calendar days. Def. Mot. at 8-12. Plaintiff contends that the length of her absence is insufficient to support Defendant's doubt because Defendant had no evidence that Plaintiff's absence did or would have had a substantial and injurious impact on her job performance, such that the fit-for-duty examination was consistent with Defendant's business necessity. *See* Pl. Opp'n at 11-13. In support of this contention, Plaintiff attempts to distinguish the cases that Defendant cites for support by claiming that the circumstances in those cases could create doubt because they involved: a longer period of absence, a history of issues, evidence that the employee

posed a danger to herself or others, or evidence of hostility and paranoia. *See* Pl. Opp'n at 4. But these distinctions do not negate the fact that being absent for 52 consecutive calendar days is objectively a long period of time and that Defendant could reasonably doubt whether Plaintiff would be able to discharge her duties as a police officer after such being off-duty for nearly two consecutive months.

Accordingly, the Court finds that Defendant had three objective reasons to doubt that Plaintiff would be able to discharge her police officer duties safely, such that requiring a fit-for-duty examination was consistent with its business necessity: there was no evidence that Plaintiff's primary care doctor was aware of Plaintiff's police officer duties and that she could reliably conclude whether Plaintiff could safely discharge those duties; Plaintiff's medical certifications were outdated; and Plaintiff absence for 52 consecutive calendar days is undoubtedly a long period of time.

2. *Defendant's fit-for-duty examination serves its asserted business necessity and is no broader nor more intrusive than necessary*

Second, the Court must determine whether Defendant's fit-for-duty examination genuinely serves the safety of the public and police officers, and if the examination is no broader nor more intrusive than necessary. Defendant contends that its fit-for-duty examination is neither broader nor more intrusive than necessary because the examination focuses only on the reason(s) that a police officer, like Plaintiff, has been absent for 30 or more consecutive calendar days. Def. Opp'n at 9; D.E. 27-5 at 40:24-41:5. Defendant adds that the examination is "not a broad search for medical conditions." Def. Opp'n at 9. But rather the purpose of asking why a police officer has been absent for an extended period of time is to ascertain whether she is able to perform her duties as a police officer without risk to herself or anyone else. *See* D.E. 27-6 at 39:22-40:1. Plaintiff claims that the fit-for-duty examination is too broad and too intrusive because rather than an

17

examination conducted by Defendant's doctors, Plaintiff's job description could have been provided to Plaintiff's primary care doctor, who could have then been asked whether Plaintiff was able to perform the essential functions of her police officer duties.  Pl. Mot. at 27.  The Court agrees with Defendant.

The required fit-for-duty examination genuinely serves the safety of the public and Defendant's police officers because its purpose is to ensure that a police officer returning to work after an extended absence is physically and psychologically able to discharge her police officer duties without endangering herself and others.  For example, Dr. Fisher, one of Defendant's doctors, provided a helpful hypothetical scenario that demonstrates why a fit-for-duty examination is necessary before concluding that a police officer is fit-for-duty: a police officer loses her vision in one eye following a car accident, but her primary care doctor clears her to return to work because her doctor doesn't understand the job requirements of a police officer, despite the fact that the police officer is actually not fit-for-duty because police officers are required to have binocular vision, which Defendant's fit-for-duty examination would have revealed because Defendant's doctors are familiar with police officer duties.  D.E. 27-5 at 40:6-41:20.

In Dr. Fisher's hypothetical scenario, if Defendant were to rely on the opinion of the police officer's primary care doctor and did not require its own fit-for-duty examination, then Defendant would endanger the safety of the public and its police officers.  Specifically, the Court can identify several duties typical of Defendant's police officers that a police officer with limited vision would be unable to carry out in an objectively safe manner, including: carrying a weapon; driving a car while on patrol duty; directing the flow of traffic on bridges; fighting a fire; and apprehending and arresting a suspect.  Thus, the Court concludes that asking why a police officer has been absent for

30 or more consecutive calendar days is consistent with Defendant's business interest in promoting the safety of the public and its police officers.

Additionally, the fit-for-duty examination is narrowly tailored and no more intrusive than necessary. Again, the purpose of the examination is limited: it seeks only to ascertain whether the reason(s) that caused a police officer to be absent from work for 30 or more consecutive calendar days will prevent the police officer from discharging her duties without endangering herself or others. Defendant's doctors, who conduct the fit-for-duty examinations, testified to just that. *See* D.E. 27-5 at 40:24-41:5 ("[T]he examination is focused on why [the police officer was] out for whatever period of time it was for that particular absence, so the examination is very focused. We don't do anything else but focus on the reason for that absence."); *see also* D.E. 27-6 at 39:22-40:1 (stating that the purpose of the fit-for-duty examination is "to determine if a person is able to medically perform the duties of their job without risk to themselves or anyone else.").

Furthermore, the Court finds Plaintiff's argument that Defendant's fit-for-duty examination is too broad and intrusive, simply because Defendant's doctors refused to rely on the medical certifications provided by Plaintiff's primary care doctor, unpersuasive. Plaintiff's argument that Defendant's doctors could have provided Plaintiff's primary care doctor with her job description, so that her primary care doctor could determine whether she was fit-for-duty is similarly unpersuasive. *See* Pl. Opp'n at 21. In support of her argument, Plaintiff attempts to demonstrate that Defendant's doctors are not better positioned than her own primary care doctor to determine whether she is fit-for-duty. *See id.* If this were true, then Defendant's fit-for-duty examination would be too broad and intrusive, because instead of conducting the examination, Defendant could just rely on the medical certifications provided by Plaintiff's doctor.

Plaintiff's only evidence that Defendant's doctors are not better positioned to determine whether she is fit-for-duty is that one of Defendant's doctors was unable to list all of Plaintiff's duties, by memory, when asked to list them during a deposition.  *See id.*  Instead, to expect that a doctor be familiar with every single duty of every single police officer employed by Defendant without referencing a police officer's specific job description is unrealistic, especially considering the numerous duties of and sheer number of Defendant's police officers.  *See supra*, Section III.B.1.  Plaintiff's position completely overlooks the fact that during an actual fit-for-duty examination Defendant's doctors would have access to a police officer's specific job description. *See* D.E. 27-6 at 40:8-16.  Additionally, after referencing a police officer's specific job description, Defendant's doctors would undoubtedly be able to draw on their past experiences and personal familiarity with examining other police officers with the same job description to ascertain whether the police officer would be able to discharge her specific duties safely.  *See* D.E. 27-6 at 41:23-25.

In contrast, even if Plaintiff's primary care doctor had Plaintiff's specific job description in front of her, she would not be able to draw on past experiences and personal familiarity to determine whether Plaintiff was, in fact, fit to discharge those duties safely.  The Court adds that Dr. Fisher's hypothetical scenario, described above, further demonstrates why doctors familiar with the duties of a police officer, like Defendant's doctors, are better positioned to make the final determination about a police officer's ability to perform her duties safely.  Thus, with this context, the Court finds objectively reasonable the determination of Defendant's doctors to not rely on the medical certifications provided by Plaintiff's primary care doctor, as well as Defendant's decision not to simply provide Plaintiff's primary care doctor with Plaintiff's job description and have her determine whether Plaintiff was fit-for-duty.

Lastly, another one of Plaintiff's suggested alternative methods for determining whether a police officer is fit-for-duty is broader and more intrusive than Defendant's narrowly tailored fit-for-duty examination.  Specifically, Plaintiff suggests that "even without information about what led to an officer's lengthy sick leave," a doctor "could administer a battery of tests to determine whether the officer is physically and/or psychologically capable of performing their job duties" or, in the case of a psychological fit-for-duty examination, Defendant's psychologist, "Dr. Francis, could administer a general psychological evaluation to determine an officer's fitness-for-duty." Pl. Opp'n at 9.  In contrast, Defendant's fit-for-duty examination does not unnecessarily probe into all facets of a police officer's physical and/or psychological well-being, but rather, focuses on the cause of a police officer's extended leave of absence solely for the purpose of determining whether the police officer is fit-for-duty.

Accordingly, the Court finds that Defendant's fit-for-duty examination serves its asserted business necessity and is no broader nor more intrusive than necessary.

3. *Defendant's reasons for defining the class of police officers subject to the Extended Leave Policy as it did are consistent with its business necessity of promoting safety*

Finally, the Court must determine whether Defendant's reasons for defining the class of police officers—those required to pass a fit-for-duty examination according to the Extended Leave Policy—are consistent with Defendant's vital business necessity of promoting the safety of the public and its police officers.  Under the Extended Leave Policy, only police officers who have taken 30 or more consecutive calendar days of medical leave are required to pass a fit-for-duty examination.  D.E. 27-4.  Defendant argues that it determined that 30 days was the appropriate amount of time after which Defendant would require a fit-for-duty examination only after conducting research into medical conditions and the applicable law.  *See* Def. Opp'n at 9.  Plaintiff responds that Defendant has not reasonably defined the class impacted by the Extended Leave

Policy because the length of a police officer's absence is not determinative as to whether she is fit-for-duty, still suffering from a medical condition, or if the reason(s) for the absence affects her ability to safely and effectively perform her duties when attempting to return to work.  *See* Pl. Opp'n at 18.  The Court finds that Defendant's reliance on research and the applicable law in defining the class is consistent with promoting the safety of the public and its police officers.

In *Conroy*, where a Department of Corrections attendance policy was questioned, the Second Circuit explained that courts should "grant some deference to the employer in determining how to define a class subject to a general policy[,]" and that the fact that a policy may require "some individual employees who do not pose a health or security risk" to comply "does not undermine the policy if the employer has defined the class of employees reasonably in choosing absences of a certain length."  333 F.3d at 101.  The Court agrees with *Conroy* that deference should be given to an employer, especially in circumstances, such as this these, where failure to ensure that an employee is fit-for-duty upon returning from an extended leave of absence for an unknown reason could prove costly to the safety of the public and other employees.  Here, the Court finds that Defendant reasonably defined the class of police officers subject to fit-for-duty examinations upon returning from an extended leave because Defendant's police officers are armed and their duties involve high-stakes (*e.g.*, apprehending and arresting suspects). Considering the wide-ranging duties of Defendant's police officers, it is reasonable for Defendant to subject all of its police officers, who are armed, to its fit-for-duty examination upon returning from leave that extends beyond 30 or more consecutive calendar days.

Additionally, the Court finds Defendant's defined length—30 or more consecutive calendar days—of extended leave that triggers the fit-for-duty examination to be consistent with its business necessity.  First, Defendant revised its earlier policy (which was rejected in *Port Auth.*

*Police Benevolent Ass'n*) that required a police officer to report to OMS on their sixth day of absence; Defendant revised its policy to 30 or more consecutive calendar days, which substantially narrows the defined class.  Second, Dr. Fisher, one of Defendant's doctors, testified that the 30-day timeframe was based on research.  *See* D.E. 27-5 at 40:2-18.  Specifically, Dr. Fisher provided that at the time the Extended Leave Policy was being revised that Defendant's doctors discussed and reviewed textbooks that described significant medical conditions that could lead to a person taking medical leave.  *Id.* at 38:10-40:18.  Based on that information, Defendant's doctors concluded that 30 days was an appropriate amount of time after which a fit-for-duty examination would be appropriate to ensure that a police officer returning from extended leave is not suffering from a significant medical condition that could prevent her from discharging her duties as a police officer safely.  *See id.*

Accordingly, the Court finds that Defendant's defined class is consistent with its business necessity.

### 4. *Business Necessity Exception applied to Plaintiff*

The Court now applies its conclusions to Plaintiff's specific circumstances.  Defendant has a vital business interest in ensuring that Plaintiff was in fact able to discharge her duties safely.  Pursuant to the Extended Leave Policy, Plaintiff was required to pass a fit-for-duty examination before returning to her patrol duties because she was absent for 30 or more consecutive calendar days.  Specifically, Plaintiff was absent from work for 52 consecutive calendar days.  In conducting Plaintiff's fit-for-duty examination, Defendant's doctors attempted to ascertain the reason(s) for Plaintiff's extended absence, so that they could determine whether Plaintiff was fit to return to her patrol duties, which involved carrying a weapon.  Instead, Plaintiff refused to answer this narrow question.  As a result, Defendant's doctors refused to conclude that Plaintiff was fit-for-duty and

Plaintiff was not permitted to return to her patrol duties.  Without knowing the reason(s) that caused Plaintiff to be absent from work for 52 consecutive calendar days, Defendants' doctors could not ascertain whether Plaintiff was in fact able to discharge her duties safely.  Without this knowledge, Defendant's doctors could not, under the Extended Leave Policy, conclude that Plaintiff was fit-for-duty.

The Court concludes that Plaintiff has not raised any genuine disputes of material fact with respect to Defendant's Extended Leave Policy and its application to her.  Thus, for the reasons explained herein, Defendant is entitled to summary judgment.

## IV.        CONCLUSION

For the reasons stated herein, Plaintiff's motion for summary judgment will be DENIED, and Defendant's motion for summary judgment will be GRANTED.  An appropriate Order accompanies this Opinion.


Dated: November 28, 2022

_____
Hon. Evelyn Padin, U.S.D.J.